UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

UNITED STATES OF AMERICA

    - against -

ARTUR DUBCEAC,

              Defendant.

------------------------------------X

09 Cr. 1164-01 (RWS)

SENTENCING OPINION

**Sweet, D.J.**

        On August 13, 2010, Artur Dubceac, a/k/a "Vincente Mirente," a/k/a "Dann Forsstrom," a/k/a "Ast Tisinienl," ("Dubceac" or "Defendant") pleaded guilty to one count of conspiracy to commit wire and bank fraud, in violation of 18 U.S.C. § 1349, and one count of bank fraud, in violation of 18 U.S.C. § 1344 and 2.  For the reasons set forth below, Dubceac will be sentenced to 41 months imprisonment followed by 4 years of supervised release, subject to the scheduled sentencing hearing.  Dubceac will be required to make restitution totaling $330,800.  Defendant will also be required to pay a special assessment of $200.

1

**Prior Proceedings**

On July 30, 2010, Superseding Information 09 CR 1164-01 (RWS) was filed in the Southern District of New York. Count 1 charges that from December 2008 until October 2009, in the Southern District of New York and elsewhere, Artur Dubceac and others known and unknown conspired to commit wire and bank fraud, in violation of 18 U.S.C. § 1349. Count 1 charges that as part of this conspiracy, Dubceac and others known and unknown devised a scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses and for the purpose of executing such scheme, transmitted and caused to be transmitted by means of wire and radio communication in interstate commerce, a writing, sign, signal, picture and sound, in violation of 18 U.S.C. § 1343. Count 1 further charges that as part of the conspiracy, Dubceac and others known and unknown executed a scheme to defraud financial institutions, the deposits of which were then insured by the Federal Deposit Insurance Corporation, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of such financial institutions, by means of false and fraudulent pretenses, representations, and promises, in violation of 18 U.S.C. § 1344.

2

Count 2 charges that at least in December 2008 until October 2009, in the Southern District of New York and elsewhere, Dubceac submitted and caused to be submitted false identification, among other things, to Bank of America and J.P. Morgan Chase banks in order to open bank accounts and then to make cash withdrawals, in violation of 18 U.S.C. § 1344 and 2.

On August 13, 2010, Dubceac appeared before the Honorable Debra C. Freeman in the Southern District of New York and pleaded guilty to Counts 1 and 2.

Dubceac's sentencing is currently scheduled for April 4, 2011.

**The Sentencing Framework**

In accordance with the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), and the Second Circuit's decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the advisory Guidelines. Thus, the

3

sentence to be imposed here is the result of a consideration of:

    (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)    the need for the sentence imposed —

        (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

        (B)    to afford adequate deterrence to criminal conduct;

        (C)    to protect the public from further crimes of the defendant; and

        (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

    (3)    the kinds of sentences available;

    (4)    the kinds of sentence and the sentencing range established for —

        (A)    the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;

    (5)    any pertinent policy statement . . . [issued by the Sentencing Commission];

    (6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

    (7)    the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether

that sentence is a so-called Guidelines sentence or not.   See
Crosby, 397 F.3d at 114-15.


**The Defendant**


        The   Court   adopts   the   facts   set   forth   in   the
Presentence   Investigation   Report   ("PSR")   with   respect   to
Dubceac's personal and family history.


**The Offense Conduct**


        The   following   description   draws   from   the   PSR.    The
specific  facts  of  the  underlying  conduct  are  adopted  as  set
forth in that report.


        Bank  of  America  received  from  both  the  Federal  Bureau
of  Investigation  and  victims,  copies  of  documents  reflecting
complaints from over 50 victims (the "Victim Reports") regarding
a   fraudulent   online   scheme.    A   Bank   of   America   employee
("Employee-1")   informed   that   the   fraudulent   online   scheme
involved  victims  who  attempted  to  purchase  goods  online  and
wired money to sellers, but never received the goods.

On December 16, 2008 Account-1 was opened at a branch of Bank of America in Manhattan, New York.  Account-1 was opened in the name of an individual ("Individual-1"), and Bank of America was presented with a Spanish Passport and Driver's License in Individual-1's name.

On December 18, 2008, December 22, 2008, January 20, 2009, and January 26, 2009, four wire transfers totaling approximately $26,700 were made into Account-1 from the accounts of four other individuals (the "Victims").

On December 19, 2008, December 23, 2008, January 20, 2009, and January 27, 2009, Dubceac, using an ATM card or other means of identification in Individual-1's name containing a photograph, made three withdrawals from Account-1 at Bank of America locations in Manhattan, New York, one withdrawal at a Bank of America location in Brooklyn, New York, and nine withdrawals at ATM machines in Manhattan, New York.  These withdrawals totaled approximately $26,640.  Employee-1 advised that Bank of America records indicated that each withdrawal from Accounnt-1 was made by the use of either an ATM card in the name of Individual-1 or a means of identification containing a photograph in the name of Individual-1.  The case agent reviewed

6

bank surveillance photographs taken during each of the withdrawals from Account-1 and observed Dubceac in person since his arrest. The surveillance photographs taken during the withdrawals from Account-1 depict Dubceac.

On January 20, 2009, Account-2 was opened at a branch of Bank of America in Manhattan, New York. Account-2 was opened in the name of another individual ("Individual-2"), and Bank of America was presented with a Spanish Passport and Spanish Driver's License in Individual-2's name.

From January 22, 2009 to February 4, 2009, eight wire transfers totaling approximately $31,935 were made into Account-2 from the accounts of other individuals (additional "Victims").

According to the Victim Reports, each one of these eight Victims stated that these wire transfers were intended to pay for goods that the victims had purchased over the internet – goods that the victims never received.

From January 23, 2009 to February 4, 2009, Dubceac, using an ATM card or other means of identification in Individual-2's name containing a photograph, made eight

7

withdrawals from Account-2 at teller windows at Bank of America locations in Manhattan, New York, and nine withdrawals at ATM machines in Manhattan, New York, totaling approximately $31,820. Employee-1 advised that Bank of America records indicate that each withdrawal from Accounnt-2 was made by the use of either an ATM card in the name of Individual-2 or a means of identification containing a photograph in the name of Individual-2.   The case agent reviewed bank surveillance photographs taken during each withdrawal from Account-2.   The surveillance photographs taken during the withdrawals from Account-2 depict Dubceac.

On January 26, 2009, Account-3 was opened at a branch of Bank of America in Manhattan, New York.  Account-3 was opened in the name of another individual ("Individual-3"), and Bank of America was presented with a Spanish Passport and credit card in Individual-3's name.

From February 4, 2009 to February 12, 2009, six wire transfers totaling approximately $35,700 were made into Account-3 from the accounts of other individuals (additional "Victims").

According to the Victim Reports, each one of these six

8

Victims stated that these wire transfers were intended to pay for goods that the victims had purchased over the internet – goods that the victims never received.

From February 4, 2009 to February 12, 2009, Dubceac, using an ATM card or other means of identification in Individual-3's name containing a photograph, made approximately six withdrawals from Account-3 at teller windows at Bank of America locations in Manhattan, New York, and at least one withdrawal from Account-3 at ATM machines in Manhattan, New York, totaling approximately $35,623. Employee-1 advised that Bank of America records indicate that each withdrawal from Accounnt-3 was made by the use of either an ATM card in the name of Individual-3 or a means of identification containing a photograph in the name of Individual-3. The case agent reviewed bank surveillance photographs taken during each withdrawal from Account-3. The surveillance photographs taken during the withdrawals from Account-3 depict Dubceac.

On February 27, 2009, Account-4 was opened at a branch of Bank of America in Manhattan, New York. Account-4 was opened in the name of another individual ("Individual-4"), and Bank of America was presented with a Belgium Passport and credit card in

9

Individual-4's name.

On March 2, 2009 and March 3, 2009, two wire transfers totaling approximately $31,800 were made into Account-4 from the accounts of two other individuals (additional "Victims").

According to the Victim Reports, each one of these two Victims stated that these wire transfers were intended to pay for goods that the victims had purchased over the internet – goods that the victims never received.

From February 27, 2009, Dubceac, using an ATM card or other means of identification in Individual-4's name containing a photograph, made two withdrawals from Account-4 at ATM machines in Manhattan, New York, totaling approximately $1,000. Employee-1 advised that Bank of America records indicate that each withdrawal from Accounnt-4 was made by the use of either an ATM card in the name of Individual-4 or a means of identification containing a photograph in the name of Individual-4. The case agent reviewed bank surveillance photographs taken during each withdrawal from Account-4. The surveillance photographs taken during the withdrawals from Account-4 depict Dubceac.

10

On February 9, 2009, Account-5 was opened at a branch of Bank of America in Manhattan, New York.  Account-5 was opened in the name of another individual ("Individual-5"), and Bank of America was presented with a Spanish Passport and credit card in Individual-5's name.

On February 23, 2009, February 24, 2009, and March 2, 2009, three wire transfers totaling approximately $31,200 were made into Account-5 from the accounts of other individuals (additional "Victims").

According to the Victim Reports, each one of these Victims stated that these wire transfers were intended to pay for goods that the victims had purchased over the internet – goods that the victims never received.

From February 24, 2009 to March 2, 2009, Dubceac, using an ATM card or other means of identification in Individual-5's name containing a photograph, made three withdrawals from Account-5 at teller windows at Bank of America locations in Manhattan, New York, and at least two withdrawals from ATM machines in Manhattan, New York, totaling approximately

11

$31,200.   Employee-1 advised that Bank of America records indicate that each withdrawal from Accounnt-5 was made by the use of either an ATM card in the name of Individual-5 or a means of identification containing a photograph in the name of Individual-5.   The case agent reviewed bank surveillance photographs taken during each withdrawal from Account-5.   The surveillance photographs taken during the withdrawals from Account-5 depict Dubceac.

On February 9, 2009, Account-6 was opened at a branch of Bank of America in Manhattan, New York.  Account-6 was opened in the name of another individual ("Individual-6"), and Bank of America was presented with a Spanish Passport and credit card in Individual-6's name.

On February 11, 2009, and February 13, 2009, two wire transfers totaling approximately $20,750 were made into Account-6 from the accounts of other individuals (additional "Victims").

According to the Victim Reports, each one of these Victims stated that these wire transfers were intended to pay for goods that the victims had purchased over the internet - goods that the victims never received.

12

From February 11, 2009 to February 13, 2009, Dubceac, using an ATM card or other means of identification in Individual-6's name containing a photograph, made two withdrawals from Account-6 at teller windows at Bank of America locations in Manhattan, New York, and at least two withdrawals from Account-6 at ATM machines in Manhattan, New York, totaling approximately $20,700. Employee-1 advised that Bank of America records indicate that each withdrawal from Accounnt-6 was made by the use of either an ATM card in the name of Individual-6 or a means of identification containing a photograph in the name of Individual-6. The case agent reviewed bank surveillance photographs taken during each withdrawal from Account-6. The surveillance photographs taken during the withdrawals from Account-6 depict Dubceac.

On March 17, 2009, Account-7 was opened at a branch of Bank of America in Manhattan, New York. Account-7 was opened in the name of another individual ("Individual-7"), and Bank of America was presented with a Spanish Passport and credit card in Individual-7's name.

On March 31, 2009, April 26, 2009, and April 28, 2009,

13

approximately three wire transfers totaling approximately $36,325 were made into Account-7 from the accounts of other individuals (additional "Victims").

According to the Victim Reports, each one of these three Victims stated that these wire transfers were intended to pay for goods that the victims had purchased over the internet – goods that the victims never received.

From April 3, 2009, to April 6, 2009, Dubceac, using an ATM card or other means of identification in Individual-7's name containing a photograph, made one withdrawal from Account-7 at a teller window at a Bank of America location in Manhattan, New York, and at least five withdrawals from Account-7 at ATM machines in Manhattan, New York, and Brooklyn, New York, totaling approximately $11,500. Employee-1 advised that Bank of America records indicate that each withdrawal from Accounnt-7 was made by the use of either an ATM card in the name of Individual-7 or a means of identification containing a photograph in the name of Individual-7. The case agent reviewed bank surveillance photographs taken during each withdrawal from Account-7. The surveillance photographs taken during the withdrawals from Account-7 depict Dubceac.

14

On April 1, 2009, Account-8 was opened at a branch of Bank of America in Manhattan, New York.  Account-8 was opened in the name of another individual ("Individual-8"), and Bank of America was presented with a Spanish Passport in Individual-8's name.

On April 2, 2009, three wire transfers totaling approximately $14,500 were made into Account-8 from the accounts of other individuals (additional "Victims").

According to the Victim Reports, each one of these three Victims stated that these wire transfers were intended to pay for goods that the victims had purchased over the internet – goods that the victims never received.

On April 2, 2009, and April 3, 2009, Dubceac, using an ATM card or other means of identification in Individual-8's name containing a photograph, made two withdrawals from Account-8 at teller windows at Bank of America locations in Manhattan, New York, and five withdrawals from Account-8 at ATM machines in Manhattan, New York, totaling approximately $13,800.  Employee-1 advised that Bank of America records indicate that each

15

withdrawal from Accounnt-8 was made by the use of either an ATM card in the name of Individual-8 or a means of identification containing a photograph in the name of Individual-8.  The case agent reviewed bank surveillance photographs taken during each withdrawal from Account-8.  The surveillance photographs taken during the withdrawals from Account-8 depict Dubceac.

On April 10, 2009, Account-9 was opened at a branch of Bank of America in Manhattan, New York.  Account-9 was opened in the name of another individual ("Individual-9"), and Bank of America was presented with a Lithuanian Passport in Individual-9's name.

On May 8, 2009, and May 11, 2009, two wire transfers totaling approximately $23,500 were made into Account-9 from the accounts of other individuals (additional "Victims").

According to the Victim Reports, each one of these two Victims stated that these wire transfers were intended to pay for goods that the victims had purchased over the internet – goods that the victims never received.

On May 11, 2009, Nicolie Munteanu, using an ATM card

16

or other means of identification in Individual-9's name containing a photograph, made two withdrawals from Account-9 at a teller window at a Bank of America location in Miami, Florida, totaling approximately $11,000. Employee-1 advised that Bank of America records indicate that each withdrawal from Accounnt-9 was made by the use of either an ATM card in the name of Individual-9 or a means of identification containing a photograph in the name of Individual-9. The case agent reviewed bank surveillance photographs taken during each withdrawal from Account-9. The surveillance photographs taken during the withdrawals from Account-9 depict Munteanu.

On May 6, 2009, Account-10 was opened at a branch of Bank of America in Manhattan, New York. On May 19, 2009, Account-11 was opened at a branch of Bank of America in Key Biscayne, Florida. Account 10 was "linked" to account 11.

Account-10 and Account-11 were opened in the name of another individual ("Individual-10"), and Bank of America was presented with a Lithuanian Passport and Lithuanian Driver's License in Individual-10's name. The case agent reviewed bank surveillance photographs taken during the opening of Account-11 and has observed Munteanu in person since he was arrested. The

17

surveillance photographs taken during the opening of Account-11 referenced above depict Munteanu.

On July 7, 2009, and July 10, 2009 approximately two wire transfers totaling approximately $31,000 were made into Account-10 from the accounts of other individuals (additional "Victims").

According to the Victim Reports, each one of these two Victims stated that these wire transfers were intended to pay for goods that the victims had purchased over the internet – goods that the victims never received.

From July 8, 2009, to July 13, 2009, Munteanu, using an ATM card or other means of identification in Individual-10's name containing a photograph, made five withdrawals from Account-11 at teller windows at Bank of America locations in Miami, Florida, and Aventura, Florida, and one withdrawal from an ATM machine in Miami, Florida, totaling approximately $31,000. Employee-1 advised that Bank of America records indicate that each withdrawal from Accounnt-11 was made by the use of either an ATM card in the name of Individual-10 or a means of identification containing a photograph in the name of

18

Individual-10.    The  case  agent  reviewed  bank  surveillance photographs taken during each withdrawal from Account-11.    The surveillance  photographs  taken  during  the  withdrawals  from Account-11 depict Munteanu.

On October 8, 2009, Dubceac and Munteanu were arrested by FBI agents.

A  search  was  performed  on  Dubceac,  and  the  following items  were  found  on  his  person:  a  Finnish  Passport  and  an International Driver's License in the name "Nann Forsstrom," and a  Lithuanian  Passport  and  Lithuanian  Driver's  License  in  the name "Ast Tisiniel."   Each of these four documents contained a photograph  that  appears  to  depict  Dubceac.    The  following additional items were found on Dubceac's person:  temporary Bank of America debit cards that did not contain any name.

In    the    course    of    obtaining    Munteanu's    pedigree information, he was asked what his name was.   Munteanu stated that he did not know whether it would be better or not to give his real name, and he declined to do so.   Munteanu explained that he asked the arresting agents whether it would be better or not to answer any questions, and after being informed that he

was under no obligation to answer their questions, he declined to do so.

A search was performed on Munteanu and the following item was found:  a Lithuanian Passport in the name "Darius Navickas," which contained a photograph that appears to depict Munteanu.

According to the government, Dubceac is being held accountable for approximately $819,134.00 in losses.

**The Relevant Statutory Provisions**

For Count 1, pursuant to 18 U.S.C. § 1349, the maximum term of imprisonment is 30 years.  For Count 2, the maximum term of imprisonment is 30 years, pursuant to 18 U.S.C. § 1344.

For Count 1, if a term of imprisonment is imposed, the Court may impose a term of supervised release of not more than five years, pursuant to 18 U.S.C. § 3583(b)(1).  For Count 2, if a term of imprisonment is imposed, the Court may impose a term of supervised release of not more than five years, pursuant to 18 U.S.C. § 3583(b)(1).  Such terms of supervised release are to

run concurrently, pursuant to 18 U.S.C. § 3624(e).

For Counts 1 and 2, Defendant is not eligible for probation because the instant offenses as charged in Count 1 and Count 2 are Class B felonies for which probation has been expressly precluded by statute, pursuant to 18 U.S.C. § 3561(a)(1).

The maximum fine that may be imposed is $1,000,000 per count, pursuant to 18 U.S.C. § 3571.

Full restitution to the victim is required, pursuant to 18 U.S.C. § 3663A & 3664.

Pursuant to 18 U.S.C. § 1963(a)(1), (a)(2), & (a)(3), the Defendant must forfeit to the United States all property, real and personal, involved in the offense or traceable to such property.

A special assessment of $100 per count is mandatory, pursuant to 18 U.S.C. § 3013.

**The Guidelines**

The November 1, 2010 edition of the United States Sentencing Commission Guidelines Manual has been used in this case for calculation purposes, pursuant to § 1B1.11(a).  The Court finds the following with respect to Defendant's applicable offense level, criminal history, recognition of responsibility, and term of imprisonment:

Counts 1 and 2 are grouped pursuant to § 3D1.2(d), as the offense level is determined largely on the total amount of loss involved.  The guideline for the violation of 18 U.S.C. § 1349 is found in § 2B1.1.  The base offense level is 7, pursuant to § 2B1.1(a)(1).

Pursuant to § 2B1.1(b)(1)(H), an increase of 14 levels is warranted because the loss amount was more than $400,000 but less than $1,000,000.

Pursuant to § 2B1.1(b)(2)(A), an increase of two levels is warranted because the offense involved more than 10 victims.

Pursuant to § 2B1.1(b)(9)(B), a two level increase is

22

warranted because the offense was committed from outside of the United States.

Based on his plea allocution, Defendant has shown recognition of his responsibility for the offense. Pursuant to § 3E1.1(a), the offense is reduced two levels. Furthermore, an additional one-level reduction is warranted, pursuant to § 3E1.1(b), because Defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

Accordingly, the applicable offense level is 22.

The Defendant has no known prior criminal convictions. This warrants zero criminal history points. A total of zero criminal history points establishes a Criminal History Category of I, pursuant to the table at Chapter 5, Part A, of the Guidelines.

Based on a total offense level of 22 and a Criminal History Category of I, the Guidelines range for imprisonment is 41 to 51 months.

The Guidelines range for a term of supervised release is at least three but not more than five years per count, pursuant to § 5D1.2(a)(1). If a sentence of imprisonment of one year or less is imposed, a term of supervised release is not required but is optional, pursuant to § 5D1.1(b).

Defendant is not eligible for probation because the applicable guideline range is in Zone D of the Sentencing Table, pursuant to § 5B1.1, application note #2.

The fine range for the instant offense is $7,500 to $1 million, pursuant to § 5E1.2(c)(3)(A) and (c)(4). Subject to Defendant's ability to pay, in imposing a fine, the Court shall consider the expected costs to the Government of any imprisonment, probation, or supervised release pursuant to § 5E1.2(d)(7). The most recent advisory from the Administrative Office of the United States Courts suggests a monthly cost of $2,270.93 to be used for imprisonment, a monthly cost of $317.32 for supervision, and a monthly cost of $2,063.19 for community confinement.

24

**The Remaining Factors of 18 U.S.C. § 3553(a)**

Having engaged in the Guidelines analysis, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary," as is required by the Supreme Court's decision in Booker, 543 U.S. 220, and the Second Circuit's decision in Crosby, 397 F.3d 103. In light of the Court's statutory responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," Kimbrough v. United States, 552 U.S. 85, 102 (2007) (quoting 18 U.S.C. § 3553(a)), and having considered the Guidelines and all of the factors set forth in § 3553(a), it is determined that a Guidelines sentence is warranted in the instant case.

**The Sentence**

For the instant offenses, Dubceac will be sentenced to 41 months imprisonment and 4 years' supervised release on both counts to run concurrently.

Dubceac is directed to report to the nearest United

25

States Probation Office within seventy-two hours of release to commence his term of supervised release.  It is recommended that Dubceac be supervised by the district of his residence.

As mandatory conditions of his supervised release, Dubceac shall:  (1) not commit another federal, state, or local crime; (2) not illegally possess a controlled substance; (3) not possess a firearm or destructive device; and (4) cooperate in the collection of DNA as directed by the probation officer.  The mandatory drug testing condition is suspended due to the imposition of a special condition requiring drug treatment and testing.

Furthermore, the standard conditions of supervision (1-13), set forth in the judgment, shall be imposed with the additional special conditions:

(1)  Defendant will participate in a program approved by the United States Probation Office, which program may include testing to determine whether Defendant has reverted to using drugs or alcohol.  The Court authorizes the release of available drug treatment evaluations and reports to the substance abuse treatment provider, as approved by the probation officer.

26

Defendant will be required to contribute to the costs of services rendered (co-payment), in an amount determined by the probation officer, based on ability to pay or availability of third-party payment.

(2) Defendant shall participate in an alcohol aftercare treatment program under a co-payment plan, which may include testing via breathalyzer at the direction and discretion of the probation officer.

(3) Defendant shall obey the immigration laws and comply with the directives of immigration authorities.

(4) Defendant shall submit his person, residence, place of business, vehicle, or any other premises under his control to a search on the basis that the probation officer has reasonable belief that contraband or evidence of a violation of the conditions of the release may be found. The search must be conducted at a reasonable time and in a reasonable manner. Failure to submit to a search may be grounds for revocation. Defendant shall inform any other residents that the premises may be subject to search pursuant to this condition.

27

(5)  Defendant shall provide the probation officer with access to any requested financial information.

(6)  Defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer unless Defendant is in compliance with the installment payment schedule.

The Court finds that the following persons have suffered injuries compensable under the Victim and Witness Protection Act in the amounts indicated:

| | |
|---|---|
| Bank of America | $170,800.00 |
| Citibank | $16,000.00 |

Restitution in these amounts should be forwarded to the following addresses:

| | |
|---|---|
| Bank of America | Citibank |
| 570 Horatio Street | 1 Court Square |
| Utica, NY 13502 | Long Island City, NY 11120 |

It is ordered that Defendant make restitution to such persons

totaling $330,800.00, except that no further payment shall be required after the sum of the amounts actually paid by all defendants has fully covered all of the compensable injuries. Any payment made by the Defendant shall be divided among the persons named in proportion to their compensable injuries.

The restitution shall be paid in monthly installments of 10% of gross monthly income over a period of supervision to commence 30 days after the release from custody.  The Defendant shall notify the United States Attorney for this district within 30 days of any change of mailing or residence address that occurs while any portion of the restitution remains unpaid.

If Defendant is engaged in a BOP non-UNICOR program, he shall pay $25 per quarter toward the criminal financial penalties.   However, if Defendant participates in the BOP's UNICOR program as a grade 1 through 4, he shall pay 50% of his monthly UNICOR earnings toward the criminal financial penalties, consistent with BOP regulations at 28 C.F.R. § 545.11.

In consideration of all the factors set forth in 18 U.S.C. § 3572(a), it does not appear that the Defendant is able to pay a fine, and so the fine in this case shall be waived.

29

Pursuant to 18 U.S.C. § 981 & 982, 21 U.S.C. § 853, and 28 U.S.C. § 2461, Defendant shall forfeit to the United States all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of said offenses.

A special assessment of $200, payable to the United States, is mandatory and shall be due immediately.

The terms of this sentence are subject to modification at the sentencing hearing scheduled for April 4, 2011.

It is so ordered.

New York, NY
April    /    , 2010

ROBERT W. SWEET
U.S.D.J.

30